IN THE UNTIED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 2:10-cr-449-1 |
| | : | |
| BARRY DOUGLAS, | : | |
| Defendant. | : | |

Goldberg, J.                                                                                              March 7, 2012

**MEMORANDUM OPINION**

On February 10, 2011, a jury convicted the Defendant, Barry Douglas, of the armed robbery of a Citizens Bank at Fifth and Godfrey Avenues in Philadelphia. Currently pending before the Court is Defendant's "Motion for a New Trial Under Rule 33(a)," wherein he alleges that certain comments by the prosecutor during closing argument were improper, that the Government violated its duty to preserve evidence, and that the interest of justice requires a new trial. For the reasons that follow, the Court finds that the issues identified by the Defendant do not justify a new trial.

**I.      Background**

The Government's evidence at trial focused on the events surrounding the robbery and the Defendant's arrest later that day. The Government called certain bank employees, including the assistant manager and one of the tellers on duty at the time of the robbery, as well as a bank customer who saw the robber flee the scene. The Defendant's former girlfriend, Tyesha Figueroa, and Officer Joseph O'Neill of the Philadelphia Police also testified in the Government's case regarding the Defendant's subsequent arrest on the afternoon of the robbery. Additionally, the Government called

1

agents Keith Holdsworth and Matthew Kessler of the Federal Bureau of Investigation to testify regarding their investigation of the robbery. Physical evidence presented by the Government included surveillance video of the robbery taken from inside of the bank, and photographs of red-stained currency that was recovered from the Defendant following his arrest. A more detailed recitation of the Government's case is as follows:

The bank's assistant manager, Sharaday Savage, testified that the Defendant entered the bank on the morning of February 10, 2011, wearing sunglasses and a hat, and asked to open an account. When Ms. Savage asked him for the necessary paperwork, he pulled a handgun from his waistband and forced her into the back area of the bank at gunpoint. The Defendant had all of the tellers on duty lay down in the vault, and Ms. Savage stayed next to him as he instructed each of the tellers to walk to their windows, place the entire money drawer into a Sneaker Villa shopping bag, and return to lay back down in the vault. As the tellers were giving the money drawers to the Defendant, Ms. Savage was able to activate a wireless alarm on her key chain. After all three tellers had emptied their drawers, the Defendant left the bank. Following the robbery, the police responded to the alarm and conducted an investigation. As part of that investigation, Detective Joseph Garvin showed Ms. Savage a photo array, and she identified the Defendant as the robber. At trial, Ms. Savage also identified the Defendant as the robber. (N.T. 2/9/2011, pp. 29-38, 55, 57, 195.)

A bank teller that was working during the robbery, Doreen Ward, corroborated Ms. Savage's testimony regarding how the robbery was carried out. Ms. Ward explained that, along with her coin tray, she inserted a red dye pack[1] into the Defendant's bag during the robbery. Although Ms. Ward

---

[1] According to the testimony of the Citizens Bank Regional Operations Manager, Kelly Malseed, a red dye pack is a security device hidden inside of a stack of bills. The packs are included in every drawer, and the tellers are trained to give the pack to a robber along with the money from

saw the robber when he entered the back area of the bank with Ms. Savage, she was unable to observe him closely because she spent the majority of the robbery face down in the vault. Ms. Ward also testified regarding an audit that she performed with the Regional Operations Manager from Citizens Bank, which indicated that $8,012.39 had been taken during the robbery. (Id., pp. 73-79, 85, 203.)

One of the bank customers, Rosanna Haines, saw the robber flee the scene. She testified that she first saw the robber, who she described as a bearded man in sunglasses and a "Panama-style" hat, inside of the bank demanding money and directing the tellers behind the bank counter. Ms. Haines immediately left the bank, and went to her car parked a short distance away. As she was turning on her cellular phone, she observed, in her side-view mirror, the robber turn the corner and run up the street perpendicular to her car. As the robber ran up the street, Ms. Haines saw a burst of red dye. Ms. Haines made a U-turn and tried to follow the robber, but lost sight of him and instead found only a bag of money in the middle of the street. Another passerby saw the bag of money, and, despite Ms. Haines' warnings, picked up the bag and walked into a nearby alley. When Ms. Haines followed this person into the alley, she found the bag abandoned and she returned to the bank to report what she saw to the police. (Id., pp. 95-96, 99-105.)

Later that afternoon, the Defendant was arrested for violating a Protection From Abuse Order (PFA) that his former girlfriend, Tyesha Figueroa, had obtained against him. Ms. Figueroa testified that she had started dating the Defendant shortly after she moved to Harrisburg in the Fall of 2009. She stated that the relationship ended in April 2010, after the Defendant became abusive, prompting

---

their drawers. The packs are designed to activate after the robber leaves the bank, releasing red dye and either smoke or tear gas. (N.T. 2/9/2011, pp. 205-206.)

her to obtain a PFA against him. (Id., p. 46.) The PFA stated that Ms. Figueroa and the Defendant were not to have any contact with each other, and Ms. Figueroa moved back to Philadelphia in June 2010. (N.T. 2/10/2011, pp. 28-30, 48, 56, 97.)

Despite the PFA, on the day of the robbery, the Defendant called Ms. Figueroa numerous times. When she finally answered one of his calls, he told her that he wanted to take her out for the day to do some shopping. Ms. Figueroa testified that she found this strange because she believed the Defendant to be unemployed. When she asked the Defendant how he had money for a shopping trip, he told her "don't worry about it," and said that he "couldn't tell [her] over the phone." Later that day, Ms. Figueroa was working at her grandmother's hair salon when the Defendant walked in and sat down. Ms. Figueroa testified that she left the salon, and called both her mother, who was nearby and who flagged down Officer O'Neill. Ms. Figueroa's mother told the officer that the Defendant was down the street and had violated a PFA. Ms. Figueroa arrived on the scene approximately five minutes later. (Id., pp. 31-34, 68 79, 97.)

Officer O'Neill stopped the Defendant, and after speaking with Ms. Firgueroa, arrested him for violation of the PFA and took him to the police station. When he asked the Defendant to empty his pockets, the Defendant began removing wads of money. The money was so soaked in red dye that the stain came off on Officer O'Neill's hands as the Defendant handed over the money. A total of $4,292 was recovered from the Defendant. (Id., pp. 98-99, 107.)

Agent Kessler testified that he took possession of the currency that had been found on the Defendant. After the money was photographed, it was given to the bank to be "returned to the Federal Reserve and switched out for clean money," meaning the stained money was taken out of circulation and destroyed. Agent Kessler testified that no testing was conducted on the money prior

to returning it to Citizens Bank, and that he knew the currency would be returned to the Federal Reserve and destroyed. According to Agent Kessler, it is "common practice" in bank robbery investigations to return currency which has been "destroyed or is tainted by the dye pack" to the bank. Photographs of the red-stained money that was in the Defendant's pockets were introduced by the Government and identified by Agent Kessler as the currency that had been recovered. (Id., pp. 138-39, 207; N.T. 2/10/2012, pp. 115, 120.)

At trial, Ms. Figueroa was shown the surveillance video from the robbery, and identified the Defendant as the robber in the video. She testified that she recognized him "by the build of his body, the way he's walking, his beard, [and] the thickness of his neck." Ms. Figueroa also testified that she recognized the pants and sneakers worn by the robber as identical to those the Defendant had owned when they were dating. She remembered that the Defendant purchased identical sneakers from a Sneaker Villa store close to her apartment in Harrisburg. (N.T. 2/10/2012, pp. 36, 38-39.)

The Defendant did not testify or call witnesses, but advanced the defense of misidentification. His counsel stressed that only one eyewitness—the assistant manager of the bank—had positively identified the Defendant as the robber. Counsel argued that Ms. Figueroa was biased because of her past relationship with the Defendant, and that her identification of the Defendant from the surveillance video was unreliable. Defense counsel also asserted that there was no physical evidence linking the Defendant to the robbery, including fingerprints or DNA evidence from the bank, and that there had been no testing performed on the currency recovered from the Defendant.

## II. Legal Standards

Under Federal Rule of Criminal Procedure 33, a "court may vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33(a). The interest of justice

requires a new trial "if errors occurred during the trial, and it is reasonably possible that such error, or combination of errors, substantially influenced the jury's decision." United States v. Rich, 326 F.Supp.2d 670, 673 (3d Cir. 2004) (citing United States v. Copple, 24 F.3d 535, 547 n. 17 (3d Cir. 1994)).

Accordingly, a court considering whether a new trial is appropriate, should first determine whether the defendant has correctly identified any errors during the trial, and, if so, undertake a harmless error analysis to determine whether those errors merit a new trial. This analysis requires consideration of the entire record, and the standard applied depends upon the nature of the error. If the error does not rise to the level of a constitutional violation, the conviction may stand so long as it is "highly probable" that the error "did not contribute to the jury's judgment of conviction." United States v. Jannotti, 729 F.2d 213, 219 (3d Cir. 1984) (quoting Gov't of Virgin Islands v. Toto, 529 F.2d 278, 284 (3d Cir. 1976)). If, however, constitutional violations have occurred, a new trial is warranted unless the violations are harmless beyond a reasonable doubt. United States v. Molina-Guevara, 96 F.3d 698, 703 (3d Cir. 1996).

With these standards in mind, we consider the Defendant's claims of error.

**III.  Discussion**

The Defendant asks that the Court vacate his conviction and order a new trial for two reasons: (1) The prosecutor made certain improper comments during her closing argument; and (2) The Government violated its duty to preserve evidence by returning the red-stained currency found on the Defendant to Citizens Bank. We address each of these claims in turn.

    **A.  Allegations of Improper Argument to the Jury**

The Defendant attacks numerous comments made by the prosecutor during her closing

argument. Some of these comments are alleged to be personal attacks on defense counsel. Others involve alleged improper vouching by the prosecutor for the veracity of a witness, or references to evidence outside of the record.

The law is clear that it is unprofessional conduct for an attorney to intentionally misstate the evidence, mislead the jury or use arguments calculated to inflame the jury. United States v. Young, 470 U.S. 1, 8 n. 5 (1985). As such, a prosecutor is to refrain from expressing "his or her personal belief or opinion as to the truth or falsity of any testimony or evidence," or making "unfounded and inflammatory attacks on the opposing advocate." Id., at 8. However, "the prosecutor is entitled to considerable latitude in summation to argue the evidence and any reasonable inferences that can be drawn from that evidence." United States v. Green, 25 F.3d 206, 210 (3d Cir. 1994) (quoting United States v. Werme, 939 F.2d 108, 117 (3d Cir. 1991)). Often "[t]he line separating acceptable from improper advocacy is not easily drawn." Young, 470 U.S. at 7.

An improper comment by the prosecutor is not sufficient, in and of itself, to justify a new trial. See United States v. Gambone, 314 F.3d 163, 179 (3d Cir. 2003). Rather, in determining whether the comments were sufficiently prejudicial to justify a new trial, the court is to consider "the scope of the comments within the context of the entire trial, the effect of any curative instructions given, and the strength of the evidence against the defendant." Id. (citing United States v. Mastrangelo, 172 F.3d 288, 297 (3d Cir. 1999)).[2]

---

[2] We note that the Defendant did not object to any of the comments which he now argues entitle him to a new trial. Federal Rule of Criminal Procedure 52 provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." FED. R. CRIM. P. 52(b). Accordingly, before a court can correct an error that was not raised at trial, "there must be (1) 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights.'" Johnson v. United States, 520 U.S. 461, 467 (1997) (quoting United States v. Olano, 507 U.S. 725, 732 (1993)). If those conditions are met, it is within the court's discretion to "notice a forfeited

1. **Personal Attacks on Defense Counsel**

The Defendant first argues that the prosecutor personally attacked his counsel at the start of her rebuttal speech by arguing that his counsel was "making up the facts" in her closing. The prosecutor made these statements at the beginning of her rebuttal, stating "She's making it up. She is making up the facts that she is asking you to consider in this case. You heard the facts. You heard the evidence. The judge told you; you decide." (N.T. 2/10/2011, p. 210.) The prosecutor then argued that defense counsel had misstated Ms. Haines' testimony:

> Ms. Henry [defense counsel] told you that Rosanna Haines testified that she saw the robber running out of the bank, that she saw a red poof come out of the bag and Ms. Henry said that Ms. Haines told you the robber dropped the bag. So, she says, "He dropped the bag, how could he have any money?" He's got the money because he had the bag.
>
> Let's talk about what Ms. Rosanna Haines told you. Here's the bank at Godfrey and North 5th. Down Godfrey, Ms. Haines is parked. She told you that when the robber was right here at the corner of Godfrey and Lawrence Streets she saw the red poof. She didn't tell you he dropped the bag. He held on to that bag of money. She told you that he turned and ran down the street and then she went and made a U-turn, lost sight of him, and then she drove down Lawrence, she didn't stay with him. What she saw was she drove the entire length of a city block. There's where she found the bag. She found that bag at the other end of Lawrence Street and Spencer. What does that mean? That means that the robber, Mr. Douglas, had an entire block. She didn't—Ms. Haines didn't tell you that the poof covered him in red. There's no evidence a poof covered him red. She [Ms. Henry] said, tear gas, you must be incapacitated. She [Ms. Haines] didn't tell you that there was a poof and he fell down incapacitated. She told you he kept running. He kept running. You can infer that he got money out of that bag and then he dropped it. Your recollection controls about where Rosanna about what Rosanna Haines said. But I believe you will remember it the way I'm remembering it. She saw the poof at

error, but only if [] the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id. (internal quotation marks omitted).

>one end of the street; he makes it to the other end of the street.

(N.T. 2/10/2011, pp. 210-11.)

The prosecutor also attempted to "rebutt" defense counsel's argument that it was unlikely that the $4,000 found on the Defendant was from the robbery because substantially more money was stolen from the bank. The prosecutor stressed that, to the contrary, it was likely that the rest of the money was either discarded along with the Sneaker Villa bag, or disposed of sometime during the six hours between the robbery and the Defendant's arrest. The prosecutor concluded this part of her rebuttal stating, "Ms. Henry is making up the evidence, misstating evidence and asking you to speculate. And that's what the judge told you not to do. You decide this case based on the evidence not on speculation." (Id., p. 212.)

Based upon our review of the entire record, we find that the prosecutor's remarks were not improper. In isolation, the comment that defense counsel was "making up" evidence could be read to imply a conscious attempt to mislead the jury, which could be viewed as an attack on defense counsel's professionalism. However, when read in conjunction with the rest of the prosecutor's remarks, it is clear that the prosecutor was arguing only that defense counsel's description of the evidence was incorrect. Defense counsel argued that Ms. Haines said she saw the robber drop the Sneaker Villa bag, and that the robber was covered in the red dye. However, according to the prosecutor, Ms. Haines lost sight of the robber and found the bag laying in the street, and testified that the dye pack exploded and the robber continued running from the bank. Indeed, the prosecutor's version is mostly consistent with Ms. Haines testimony. The prosecutor was certainly permitted to urge the jury to remember the facts a certain way. Further, the prosecutor finished her argument by reminding the jury that its recollection of Ms. Haines' testimony was ultimately controlling.

The Defendant also argues that, immediately prior to the remarks discussed above, the prosecutor made an improper comment that is not reflected in the written or audio record. Specifically, the Defendant alleges that at the very beginning of the prosecutor's rebuttal speech, she turned away from the podium toward the defense table, pointed to defense counsel and said either that defense counsel was "lying" or was a "liar." Such a comment could constitute an improper attack on defense counsel's ethics. For several reasons, even if such a comment was in fact made, it is does not justify a new trial.[3]

First, the fact that the alleged comment(s) were not recorded by the court's audio equipment, and were alleged to have been made by the prosecutor while her back was turned away from the jury, makes it unlikely that the jury even heard the alleged comments. Further, even when these comments are considered together with the statement that defense counsel was "making up" evidence, the prosecutor's remarks were an extraordinarily minor part of the proceedings. If made, both comments came at the beginning of the prosecutor's rebuttal and constituted only a small part of her entire closing presentation. These remarks constituted an even smaller part of the two-day trial which led to the Defendant's conviction.

Additionally, the Government's evidence of guilt was compelling. The Defendant, who Ms. Figueroa testified was unemployed, was arrested with over $4,000 in red-stained currency six hours after the robbery. He was identified as the robber by both Ms. Figueroa and Ms. Savage, and Ms. Figueroa identified several articles of clothing worn by the robber as identical to clothing owned by the Defendant during their relationship. The Defendant also made what could be considered an

---

[3] In his motion for a new trial, Defendant requests an evidentiary hearing on the issue of whether or not the prosecutor called defense counsel a "liar." No hearing is necessary given our conclusion that this comment, even if it occurred, does not entitle the Defendant to a new trial.

inculpatory statement to Ms. Figueroa—that he had a large sum of money, but that he could not talk about its origin over the phone. When viewed in light of the evidence presented by the Government at trial, it cannot be said that the comments Defendant complains about in any way caused prejudice.

### 2. Allegations of "Vouching" or "Improper Testimony" by the Prosecutor

The Defendant has also identified nine remarks by the prosecutor which he contends suggested to the jury that the prosecutor had knowledge outside of the record, and constituted improper "vouching" for the reliability of a government witness. In order for a remark by the prosecutor to be considered "vouching," two criteria must be met: (1) The prosecutor must assure the jury that the testimony of a Government witness is credible; and (2) This assurance is based on either the prosecutor's personal knowledge, or other information not contained in the record." United States v. Walker, 155 F.3d 180, 187 (3d Cir. 1998). The Defendant argues the following comments were improper:

1. "Red dye's not permanent. There's no evidence that red dye is permanent. Believe me, red dye can be gotten off or people would be walking around with red dye for the rest of their lives." (N.T. 2/10/2011, p. 212.)

2. When Ms. Figueroa "looked at the bank surveillance video, she knew right away it was [the Defendant]." (N.T. 2/10/2011, p. 160.)

3. Ms. Savage was "not trying to identify the photograph of Barry Douglas by thinking about the videos." (N.T. 2/10/2011, p. 166.)

4. "Ladies and gentlemen, Ms. Figueroa is not out to get Barry Douglas . . . she came to court reluctantly, but she came committed to tell the truth. And I submit to you that's what she did." (N.T. 2/10/2011, p. 167.)

5. Ms. Figueroa had "no reasons to lie." (N.T. 2/10/2011, p.

11

      171.)

6.    "The customers can't even see what's going on [during the robbery]." (N.T. 2/10/2011, p. 214.)

7.    The prosecutor's references to the Defendant's "plan" and his "thinking" during the robbery. (N.T. 2/10/2011, pp. 157-58, 170.)

8.    When Ms. Savage was shown the photo array "she picked out the photo of Barry Douglas and immediately said, that's the robber. She told you she said it immediately." (N.T. 2/10/2011, p. 159.)

9.    "When [Ms. Savage] sat on the stand and we asked her a question and she wasn't sure, she said I'm not sure." (N.T. 2/10/2011, p. 165.)

Viewed in the context of the prosecutor's summation, nearly all of these comments constitute proper argument permitting the jury to draw a particular reasonable inference from the evidence. See United States v. Werme, 939 F.2d 108, 117 (3d Cir. 1991) (a "prosecutor is entitled to considerable latitude in summation to argue the evidence and any reasonable inferences that can be drawn from that evidence.") More importantly, none of the comments in any way suggested to the jury that the prosecutor had knowledge outside of the record evidence

The prosecutor's argument that Ms. Figueroa "knew right away" that it was the Defendant in the surveillance video was supported by Ms. Figueroa's testimony that the characteristics of the robber matched what she knew about the Defendant. (N.T. 2/10/2011, p. 160 (Ms. Figueroa "recognized his nose, his lips, his profile, his fuller beard. She recognized his walk. She told you he kind of juts his chin out a little bit when he walks and I think you could see that a little bit on the video. She told you about his broad back. She recognized his pants. When you live with somebody you get to know all their clothes.").) Similarly, the prosecutor's argument that Ms. Figueroa had "no

reason to lie," and came to court to tell the truth rather than because of a vendetta against the Defendant, was based upon Ms. Figueroa's testimony that she was reluctant to testify. (See N.T. 2/10/2011, p. 35.)

Nor did the prosecutor's argument that the customers could not see the robber suggest knowledge outside of the record. Rather, the prosecutor asked the jury to draw this inference based upon what was shown in the surveillance video. (Id., p. 214.) The prosecutor's argument that Ms. Savage's identification of the Defendant was based upon her recollection of him from the robbery was also a proper inference to be drawn from the opportunity Ms. Savage had to observe him. (Id., p. 166.) Similarly, the prosecutor's remarks about the Defendant's "plan" were based on the methodical way in which the robbery was carried out, moving the bank employees into the vault and having them empty their drawers one at a time. (Id., pp. 157-58, 170.)

Although not based directly on evidence presented at trial, the prosecutor's comment about the impermanent nature of the red dye did not suggest any personal knowledge by the prosecutor outside of the record (i.e., that the prosecutor was an expert in red dye). Instead, the prosecutor asked the jury to use their common sense to reach a conclusion favorable to the Government—that the absence of red stain on the Defendant at the time of his arrest did not mean that he could not have committed the robbery. The rhetorical device used by the prosecutor— "believe me"—does not alter the substance of her argument as a proper appeal to the common sense of the jury. See Walker, 155 F.3d at 189 (appeal to common sense of the jury is proper argument).

The remaining remarks—that Ms. Savage testified that she identified the Defendant "immediately" from the photo array, and that she answered "I'm not sure" when she did not know

the answer to a question—were simply minor misstatements of the evidence.[4] These comments neither assured the jury that a witnesses' testimony was credible nor did they refer to any evidence outside of the record. Indeed, these remarks relate directly to Ms. Savage's testimony at trial. While these remarks may have been inaccurate, they do not constitute vouching. Further, any effect these minor misstatements may have had was adequately addressed by the instruction, given both by the Court and the prosecutor, that it was the jury's recollection of the evidence that controlled its decision. (N.T. 2/10/2011, pp. 141, 211.)

    **B.  The Government's Return of the Red-Stained Currency to Citizens Bank**

  The Defendant also argues that by returning to Citizens Bank the red-stained currency that was found in his pockets when he was arrested, with the knowledge that it would be given to the Federal Reserve for destruction, the Government breached its duty to make "earnest efforts" to preserve relevant evidence. Defendant argues that the destruction was in bad faith and violated due process. Alternatively, he argues that, even if not in bad faith, the deliberate destruction of evidence justifies a new trial under Rule 33.

  The Government asserts that a new trial would be inappropriate in these circumstances. It maintains that the destruction of evidence in this instance was in good faith and pursuant to routine practice, and, in any event, likely benefitted the Defendant because it is highly improbable that testing of the currency would have been exculpatory. The Government also points out that the Defendant never requested testing, or raised any issue related to this evidence at any time prior to, or during trial. Instead, the Defendant chose to argue that, without testing, the source of the red stain

---

[4] Detective Garvin, and not Ms. Savage, testified that her identification of the Defendant from the photo array was immediate. (N.T. 2/9/2011, pp. 195-96.) Additionally, it does not appear from the record that Ms. Savage testified that she "wasn't sure" in response to a question.

was unclear.

It is well-established that there must be a showing of bad faith in order to establish a violation of due process as a result of the Government's failure "to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." Arizona v. Youngblood, 488 U.S. 51, 57 (1988) (duty to preserve semen samples). There is no due process violation where the officers destroy evidence "in good faith and in accord with their normal practice," and the "record contains no allegation of official animus towards [the defendant] or of a conscious effort to suppress exculpatory evidence." California v. Trombetta, 467 U.S. 479, 488 (1984) (introduction of breathalyzer test where government failed to preserve underlying breath samples did not violate due process).

Here, the destruction by the Government of the evidence at issue was deliberate, but not in bad faith. Agent Kessler testified that he knew the currency would be destroyed when he returned it to Citizens Bank. (N.T. 2/10/11, p. 115.) However, he also testified that it is routine practice to return stained currency to the bank. (N.T. 2/10/11, p. 120.) A failure to preserve evidence, even if deliberate, does not violate due process if done pursuant to routine practice and without the intent to suppress exculpatory evidence. Trombetta, 467 U.S. at 488. Agent Kessler's unchallenged testimony shows that the evidence was destroyed pursuant to routine practice, and the Defendant has not identified any evidence suggesting an intent to suppress exculpatory evidence.

Moreover, the constitutional duty to preserve evidence is triggered only where the evidence "possess[es] an exculpatory value that was apparent before the evidence was destroyed." Id. at 489. Red-stained money is normally of an inculpatory, rather than exculpatory, nature. While it could possibly have been the case that testing of the currency would have revealed the stain to have an

15

origin other than the bank's dye pack, over $4000 in currency that is soaked in red dye, found on the Defendant, is not "apparently exculpatory" evidence, the destruction of which is indicative of an intent to circumvent the disclosure requirements inherent to due process.

While the Government's conduct does not constitute a violation of due process, that does not preclude it as a basis for a new trial. Under Rule of Criminal Procedure 33, it is within the discretion of the court to grant a new trial "where the interest of justice so requires." United States v. Cimera, 459 F.3d 452, 458 (3d Cir. 2006) (quoting FED.R CRIM.P. 33). It is clear that the failure to preserve evidence, whether or not it rises to the level of a constitutional violation, is not to be condoned. The importance of the Government's duty to preserve relevant evidence has long been recognized by the United States Court of Appeals for the Third Circuit:

> Loss or destruction of relevant evidence by the government not only raises general questions of the fundamental fairness of a criminal trial, but may also deny a defendant the right to compulsory process. The right to subpoena evidence at trial, and the obligation of the prosecutor to disclose exculpatory evidence are inherent in the conception of a criminal trial as a truth-seeking process. These rights and obligations may be undermined if the prosecution has no duty to preserve the evidence which it later must disclose.

Gov't of Virgin Islands v. Testamark, 570 F.2d 1162, 1166 (3d Cir. 1978)

The Government's practice of routinely returning stained currency to the bank, leading ultimately to its destruction by the Federal Reserve, did deprive the defendant of an opportunity to inspect evidence introduced at trial. Preservation of this evidence would obviously be a more prudent policy, and would more consistently provide the defendant in a subsequent trial with his right to compulsory process. Preservation would also prevent the defendant from arguing, after the money has been destroyed, that the red stain came from a source other than a bank's dye pack.

However, the interest of justice does not require a new trial in this instance. Given that the evidence is lost and irretrievable, it is unclear exactly how a new trial would be any different from the first. The stained currency that was recovered from the Defendant will not be available for testing at any subsequent trial. Indeed, in his motion for a new trial, the Defendant fails to identify evidence that was admitted at his first trial which should be excluded in a subsequent one.

A close analogue to this case is the situation faced by the Supreme Court in <u>Trombetta</u>, and discussed by the Third Circuit in <u>Testamark</u>, where the police introduced into evidence the results of certain tests performed by the government on samples that had not been preserved for defense testing. The Third Circuit suggested in <u>Testamark</u> that exclusion of the test results might be appropriate in these circumstances, although the Supreme Court held in <u>Trombetta</u> that due process does not require it. <u>Testamark</u>, 570 F.2d at 1166 n. 10; <u>Trombetta</u>, 467 U.S. 479.

Here, however, no testing of the lost evidence was ever performed or introduced at trial. It is not as though the Government performed testing which showed that the red stain was from a bank's dye pack, and then destroyed the currency, thereby preventing the Defendant from impeaching the tests performed by the Government. Instead, the Government only introduced evidence showing that the Defendant was in possession of red-stained currency—a fact which the Defendant has not disputed. Both the Government and the Defendant had an equal opportunity to argue the source of the stain to the jury. Accordingly, the trial was not tainted by the introduction of testing which the Defendant had no opportunity to challenge.

The Court must also consider that the Defendant was aware that the evidence had been lost long before trial. He had ample opportunity to object to evidence which he believed to be inadmissible by virtue of the Government's conduct. The Defendant made no such objection either

before or during trial, and instead argued to the jury that the Government had failed to prove the source of the red stain on the currency. He cannot now claim, after his conviction, that his initial strategy was unwise and he should have another trial where he can seek some unspecified evidentiary remedy for the Government's conduct. Rather, in order to justify a new trial, the Defendant must identify evidence which should have been excluded, and show that its admission constituted clear error. Johnson v. United States, 520 U.S. 461, 467 (1997). As the Defendant has not even articulated what evidence he would seek to exclude in a subsequent trial, he has fallen well short of meeting this burden.

**IV.    Conclusion**

For the above reasons, the Court finds that a new trial would not serve the interest of justice, and the Defendant's motion is without merit.

Our order follows.