**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. 10-449-1 |
| | : | |
| BARRY DOUGLAS | : | CIVIL NO. 14-2191 |
| | : | |

Goldberg, J.                                                                                        December 11, 2014

## <u>MEMORANDUM OPINION</u>

Before the Court is the <u>pro</u> <u>se</u> motion of Barry Douglas (hereinafter referred to as "Petitioner") to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255.  In his motion, Petitioner asserts that constitutionally ineffective assistance of counsel at the suppression hearing, trial, and on appeal entitles him to relief.  For the reasons set out below, I will deny his request for relief.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

On July 15, 2010, Petitioner was indicted on one count of armed bank robbery in violation of 18 U.S.C. § 2113(d).  On February 11, 2011, after a three day trial, a jury returned a verdict of guilty on that charge.  On June 22, 2011, I granted trial counsels' motion to withdraw their appearance, and appointed new counsel for post-verdict motions.  On August 16, 2011, Petitioner filed a "Motion for New Trial Under Rule 33(a)."  I denied that motion in a March 7, 2012 memorandum opinion, setting forth the following description of events leading to the conviction:0.

> The Government's evidence at trial focused on the events surrounding the robbery
> and the Defendant's arrest later that day.  The Government called certain bank

1

employees, including the assistant manager and one of the tellers on duty at the time of the robbery, as well as a bank customer who saw the robber flee the scene. The Defendant's former girlfriend, Tyesha Figueroa, and Officer Joseph O'Neill of the Philadelphia Police also testified in the Government's case regarding the Defendant's subsequent arrest on the afternoon of the robbery.  Additionally, the Government called agents Keith Holdsworth and Matthew Kessler of the Federal Bureau of Investigation to testify regarding their investigation of the robbery. Physical evidence presented by the Government included surveillance video of the robbery taken from inside of the bank, and photographs of red-stained currency that was recovered from the Defendant following his arrest.  A more detailed recitation of the Government's case is as follows:

The bank's assistant manager, Sharaday Savage, testified that the Defendant entered the bank on the morning of [June 21, 2010], wearing sunglasses and a hat, and asked to open an account.  When Ms. Savage asked him for the necessary paperwork, he pulled a handgun from his waistband and forced her into the back area of the bank at gunpoint.  The Defendant had all of the tellers on duty lay down in the vault, and Ms. Savage stayed next to him as he instructed each of the tellers to walk to their windows, place the entire money drawer into a Sneaker Villa shopping bag, and return to lay back down in the vault.  As the tellers were giving the money drawers to the Defendant, Ms. Savage was able to activate a wireless alarm on her key chain.  After all three tellers had emptied their drawers, the Defendant left the bank.  Following the robbery, the police responded to the alarm and conducted an investigation.  As part of that investigation, Detective Joseph Garvin showed Ms. Savage a photo array, and she identified the Defendant as the robber.  At trial, Ms. Savage also identified the Defendant as the robber. (N.T. 2/9/2011, pp. 29-38, 55, 57, 195.)

A bank teller that was working during the robbery, Doreen Ward, corroborated Ms. Savage's testimony regarding how the robbery was carried out.  Ms. Ward explained that, along with her coin tray, she inserted a red dye pack into the Defendant's bag during the robbery.  Although Ms. Ward saw the robber when he entered the back area of the bank with Ms. Savage, she was unable to observe him closely because she spent the majority of the robbery face down in the vault.  Ms. Ward also testified regarding an audit that she performed with the Regional Operations Manager from Citizens Bank, which indicated that $8,012.39 had been taken during the robbery.  (Id., pp. 73-79, 85, 203.)

One of the bank customers, Rosanna Haines, saw the robber flee the scene.  She testified that she first saw the robber, who she described as a bearded man in sunglasses and a "Panama-style" hat, inside of the bank demanding money and directing the tellers behind the bank counter.  Ms. Haines immediately left the bank, and went to her car parked a short distance away.  As she was turning on her cellular phone, she observed, in her side-view mirror, the robber turn the

corner and run up the street perpendicular to her car.  As the robber ran up the street, Ms. Haines saw a burst of red dye.  Ms. Haines made a U-turn and tried to follow the robber, but lost sight of him and instead found only a bag of money in the middle of the street.  Another passerby saw the bag of money, and, despite Ms. Haines' warnings, picked up the bag and walked into a nearby alley.  When Ms. Haines followed this person into the alley, she found the bag abandoned and she returned to the bank to report what she saw to the police.  (Id., pp. 95-96, 99-105.)

Later that afternoon, the Defendant was arrested for violating a Protection From Abuse Order (PFA) that his former girlfriend, Tyesha Figueroa, had obtained against him.  Ms. Figueroa testified that she had started dating the Defendant shortly after she moved to Harrisburg in the Fall of 2009.  She stated that the relationship ended in April 2010, after the Defendant became abusive, prompting her to obtain a PFA against him.  (Id., p. 46.)  The PFA stated that Ms. Figueroa and the Defendant were not to have any contact with each other, and Ms. Figueroa moved back to Philadelphia in June 2010.  (N.T. 2/10/2011, pp. 28-30, 48, 56, 97.)

Despite the PFA, on the day of the robbery, the Defendant called Ms. Figueroa numerous times.  When she finally answered one of his calls, he told her that he wanted to take her out for the day to do some shopping.  Ms. Figueroa testified that she found this strange because she believed the Defendant to be unemployed. When she asked the Defendant how he had money for a shopping trip, he told her "don't worry about it," and said that he "couldn't tell [her] over the phone."  Later that day, Ms. Figueroa was working at her grandmother's hair salon when the Defendant walked in and sat down.  Ms. Figueroa testified that she left the salon, and called both her mother, who was nearby and who flagged down Officer O'Neill.  Ms. Figueroa's mother told the officer that the Defendant was down the street and had violated a PFA.  Ms. Figueroa arrived on the scene approximately five minutes later.  (Id., pp. 31-34, 68 79, 97.)

Officer O'Neill stopped the Defendant, and after speaking with Ms. Figueroa, arrested him for violation of the PFA and took him to the police station.  When he asked the Defendant to empty his pockets, the Defendant began removing wads of money.  The money was so soaked in red dye that the stain came off on Officer O'Neill's hands as the Defendant handed over the money.   A total of $4,292 was recovered from the Defendant. (Id., pp. 98-99, 107.)

Agent Kessler testified that he took possession of the currency that had been found on the Defendant.  After the money was photographed, it was given to the bank to be "returned to the Federal Reserve and switched out for clean money," meaning the stained money was taken out of circulation and destroyed.  Agent Kessler testified that no testing was conducted on the money prior to returning it

to Citizens Bank, and that he knew the currency would be returned to the Federal Reserve and destroyed. According to Agent Kessler, it is "common practice" in bank robbery investigations to return currency which has been "destroyed or is tainted by the dye pack" to the bank. Photographs of the red-stained money that was in the Defendant's pockets were introduced by the Government and identified by Agent Kessler as the currency that had been recovered. (Id., pp. 138-39, 207; N.T. 2/10/2011, pp. 115, 120.)

At trial, Ms. Figueroa was shown the surveillance video from the robbery, and identified the Defendant as the robber in the video. She testified that she recognized him "by the build of his body, the way he's walking, his beard, [and] the thickness of his neck." Ms. Figueroa also testified that she recognized the pants and sneakers worn by the robber as identical to those the Defendant had owned when they were dating. She remembered that the Defendant purchased identical sneakers from a Sneaker Villa store close to her apartment in Harrisburg. (N.T. 2/10/2011, pp. 36, 38-39.)

The Defendant did not testify or call witnesses, but advanced the defense of misidentification. His counsel stressed that only one eyewitness—the assistant manager of the bank—had positively identified the Defendant as the robber. Counsel argued that Ms. Figueroa was biased because of her past relationship with the Defendant, and that her identification of the Defendant from the surveillance video was unreliable. Defense counsel also asserted that there was no physical evidence linking the Defendant to the robbery, including fingerprints or DNA evidence from the bank, and that there had been no testing performed on the currency recovered from the Defendant.

(doc. no. 115 at 1-5) (footnote omitted.)

The sentencing hearing was held on May 23, 2012. Under the sentencing guidelines, the offense level was 34, and in light of Petitioner's various prior convictions, I found him to be a career offender with a criminal history score of VI. This resulted in an advisory guideline range of 262-300 months.[1] I denied Petitioner's motion for a downward variance, and sentenced him to a term of incarceration of 262 months. Petitioner then appealed to the United States Court of

---

[1] Neither the Government nor Petitioner objected to that calculation. (N.T. 05/23/12 at 10-11.)

Appeals for the Third Circuit raising four issues for review.[2]  In an April 23, 2013 opinion, the Third Circuit affirmed the conviction, United States v. Douglas, 522 F. App'x 125 (3d Cir. 2013), and on May 30, 2013, the Third Circuit issued its mandate.  On April 16, 2014, Petitioner filed this § 2255 motion and accompanying memorandum of law.  The Government filed a response, and Petitioner filed a reply.  The matter is fully briefed and ready for disposition.

## II.   DISCUSSION

Petitioner raises several claims of ineffectiveness of counsel which he argues entitles him to relief under 28 U.S.C. § 2255.[3]  He first argues that appellate counsel was ineffective for failing to raise various instances of prosecutorial misconduct.  He then contends that counsel at the suppression hearing was ineffective for failing to preserve the red dye stained money, for failing to argue that the Terry stop was constitutionally unreasonable on the basis of the "completed misdemeanor" doctrine, and for failing to present phone and e-mail correspondence between himself and Figueroa.  Petitioner also argues that counsel at the suppression hearing and later at trial were ineffective for failing to call his barber as a witness, and that trial counsel was ineffective for failing to call the bank security guard and a police detective as a witness.  He further contends that counsel at both the suppression hearing and at trial were ineffective for

---

[2] On direct appeal, Petitioner argued:

> [1] that the prosecutor made improper statements during her closing statement[,] [2] that the Government violated his Fourth Amendment rights by destroying the currency it recovered from him before testing it . . . [3] that he should have been granted an evidentiary hearing to determine whether the prosecutor made improper statements during her summation . . . [and] [4] that the evidence of the red-stained currency should have been suppressed.

United States v. Douglas, 522 F. App'x 125, 127 (3d Cir. 2013).

[3] For sake of clarity, I address Petitioner's claims in a different order than they were presented in his § 2255 motion.

5

failing to present his clothing which was confiscated on the day of his arrest.  Finally, Petitioner argues that appellate counsel was ineffective for failing to appeal my denial of his motion to suppress the bank manager's identification.

### A.    Legal Standard of Ineffective Assistance of Counsel

28 U.S.C. § 2255 allows a "[a] prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution . . . [to] move the court which imposed the sentence to vacate, set aside, or correct the sentence."[4]  28 U.S.C. § 2255(a).  Petitioner claims that his sentence is unconstitutional in that it is the result of the ineffective assistance of counsel.

The Supreme Court's standard for claims of ineffective assistance of counsel in violation of the Sixth Amendment is set forth in Strickland v. Washington, 466 U.S. 668 (1984), and has been reaffirmed consistently since. According to Strickland, counsel is presumed to have acted effectively unless the petitioner can demonstrate both that (1) "counsel's representation fell below an objective standard of reasonableness" and that (2) there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 686-88, 693-94. In assessing whether counsel performed deficiently, the court must "'reconstruct the circumstances of counsel's challenged conduct' and 'evaluate the conduct from counsel's perspective at the time.'" Harrington v. Richter, 131 S.Ct. 770, 779 (2011) (quoting Strickland, 466 U.S. at 689).  Nonetheless, because the "ultimate focus of the inquiry [is] on the fundamental fairness of the proceeding whose result is being challenged . . .  a court

---

[4] A § 2255 motion must be filed within one year from "the date on which the conviction becomes final." 28 U.S.C. § 2255 (f)(1).  The Government acknowledges that Petitioner's motion is timely.

need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies."  Strickland, 466 U.S. at 696-97. In fact, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which [the Supreme Court] expect[s] will often be so, that course should be followed."[5]  Id. at 697.

### B.    Claims of Prosecutorial Misconduct

Petitioner claims that appellate counsel's failure to raise several alleged instances of prosecutorial misconduct on direct appeal violated his constitutional right to the effective assistance of counsel.  He specifically contends that the prosecution committed misconduct by failing to disclose a pending investigation into one of the Assistant U.S. Attorneys assigned to the matter, by deliberately withholding evidence from him so as to violate his right to a speedy trial, by misinforming the Court about the PFA orders, and by tainting Ms. Figueroa's identification of him as the robber in the bank surveillance videos.

### 1.    The Pending Investigation Into the Prosecutor

Petitioner first argues that one of the prosecutors who handled this case violated his due process rights in that she "deliberately suppressed that she was under investigation for engaging in prohibited political activity."  (Br. at 7-8.)  He claims that appellate counsel's failure to raise this issue on direct appeal violated his right to the effective assistance of counsel.[6]

_____

[5] Where appropriate, and consistent with the Supreme Court's prediction and directive, I have only considered the prejudice prong of the Strickland standard.

[6] Petitioner also argues that appellate counsel's failure to raise this issue on appeal constitutes cause to excuse this procedurally defaulted claim of prosecutorial misconduct.  (Br. at 6-7.)  In that I will reach the merits of this claim of prosecutorial misconduct as I discuss the prejudice prong of the Strickland standard, I need not address Petitioner's procedural default argument.

The Government acknowledges that one of the prosecutors was under investigation for "alleged Hatch Act violations" at the time of the trial.  (Resp. at 15.)  The Government correctly states however, that because "the Hatch allegations against the prosecutor had absolutely no relevance to the defendant's trial for armed bank robbery," any failure on its part to disclose the fact of the investigation did not constitute a due process violation, and appellate counsel cannot be deemed ineffective for failure to raise this issue.  (Id.)

Petitioner was not prejudiced by any failure on the part of the Government to disclose the above referenced investigation.  Although it is well established "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment," Brady v. Maryland, 373 U.S. 83, 87 (1963), the investigation in question was not in any way material to Petitioner's case.  I am aware of no precedent (and Petitioner points to none) to support the proposition that failure to disclose an investigation into a prosecutor for a matter entirely unrelated to the trial constitutes a Brady or other due process violation.

### 2.  Speedy Trial Rights

Petitioner next contends that appellate counsel was ineffective for failing to argue that the prosecutor committed prosecutorial misconduct by deliberately withholding evidence so as to "interfere with his sixth [] amendment right to a speedy trial."[7]  (Br. at 10.)  The background to

---

[7] Petitioner does not explicitly state that he is pursuing this and the subsequent prosecutorial misconduct claims under a theory of appellate counsel's ineffectiveness.  I will however construe them as such given that they appear in the same section of the brief where Petitioner challenges appellate counsel's failure to raise the issue of the pending investigation referred to above, and that these claims would be deemed waived absent a showing of cause and prejudice to excuse the procedural default were I to treat them as allegations of trial court error.  See, e.g., Estelle v. Gamble, 429 U.S. 97, 106 (1976) (stating that "a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers") (quotations

this claim arises out of the January 4, 2011 suppression hearing which was held just one week before the trial was set to begin.  At the suppression hearing, I referenced the previous pre-trial hearing that had been held in this case, and explained that Petitioner had "indicated [then] that he did not wish to waive his speedy trial rights and demanded a trial on [January] 11th.  And the Government agreed that they would be ready, despite the fact that I [thought] the original trial lawyer assigned from the U.S. Attorney's Office had some significant health issues."  (N.T. 01/04/11 at 5.)    At the suppression hearing, however, the Government stated that while it was their "good-faith understanding that, yes, everything had been turned over in discovery," they had uncovered other documents "in the course of preparing" for trial that they had just recently turned over to the defense counsel.  (Id. at 13.)   These documents included crime scene photos and statements taken by the investigating officers of two potential witnesses.[8]  (Id. at 7.)

I then asked defense counsel to address the question of "whether the Government is purposely withholding evidence or whether this is just a situation that would typically or sometimes arise when the assigned trial counsel can't try the case and it has to be turned over [to another prosecutor]."  (Id. at 18.)  Defense counsel responded stating that he had "no hesitancy in saying . . . that this is in any way something that's been done on purpose in an effort to somehow put the Defense at a disadvantage."  (Id. at 18-19.)  Defense counsel then continued that he had advised Petitioner to waive his speedy trial rights in light of the fact that "it is not unusual for

---

and citation omitted).  In so doing, I observe that the Government has addressed these claims on the merits, and will not be prejudiced by the Court doing the same.

[8] The two potential witnesses were Natasha Lang, a bank teller, and Christian Garrison, a witness who the prosecutor described as being "relevant to the search warrant."  (N.T. 01/04/11 at 14.) Neither of these witnesses testified.

documents to be provided on the eve of trial . . . and it is not unusual for the Defense to then

have to consider whether or not you can proceed in light of new information." (Id. at 19.)

> I then addressed Petitioner:
>
> So my observations based on what I've heard, everyone in the room agrees, the four lawyers and now me, agree that there are two types of situations. Unfortunately there are situations where prosecutors have been found to have intentionally and maliciously and in bad faith withhold discovery in an improper manner. I find that this is not the case. You're just going to have to take all of our words for it, including your lawyers and from me whose job it is to be objective and to make sure your rights are protected, that when you have a situation where one trial lawyer has to take over for another . . . it isn't always a perfect situation. And there are times where you believe that the prior lawyer turned over all the discovery, but upon review and meeting with witnesses, you realize that that isn't the case, so that's my conclusion.

(Id. at 20.) I then asked Petitioner how he wanted to proceed in light of the fact that "your

lawyers are telling you and me that they can't be ready by [next week] to defend you in a way

that they need to defend you." (Id. at 21.) He agreed to waive his speedy trial rights, and agreed

to a trial date of February 8, 2011. (Id. at 25-26.)

Having reviewed the transcript of the first suppression hearing, I continue to conclude

that the prosecutor did not purposefully withhold evidence so as to violate Petitioner's

constitutional right to a speedy trial. As the transcript demonstrates, the trial prosecutor had just

recently taken over the case from another prosecutor who had recently fallen ill, and the new

prosecutor disclosed the documents at issue to defense counsel in good faith and without undue

delay. Indeed, the Government was not even required to turn over the witness statements before

trial. 18 U.S.C. § 3500(a) ("In any criminal prosecution [], no statement or report in the

possession of the United States which was made by a Government witness or prospective

Government witness [] shall be the subject of subpoena, discovery, or inspection until said

witness has testified on direct examination"); see also United States v. Avelino, 129 F.Supp.2d 214, 218 (E.D.N.Y. 2001) (observing that while the government often agrees to release documents relating to a government witness before direct examination, "[a] court has no power to compel the disclosure of such material prior to that time.")  Accordingly, appellate counsel cannot be deemed ineffective for failing to present this meritless claim.

### 3.  The Protection From Abuse Orders

Petitioner next contends that appellate counsel was ineffective for failing to argue that the prosecution committed misconduct for having "attempted to manipulate the judge into believing that it was only a PFA against petitioner, from Figueroa, when in fact the record was clear it was a two-way order."[9]  (Br. at 9-10.)  With respect to the PFA order, the Government stated that:

> There was originally a temporary PFA ordered against the defendant because Ms. Figueroa had the police come to her house about April 10th or 11th.
>
> She then went to court on the 23rd and my understanding is that there is a PFA, a document, against the defendant.  I don't have a document showing a PFA against Ms. Figueroa, just the oral transcript of the judge stating you are both to stay away from each other.

(N.T. 02/09/11 at 115.)

The Government's characterization of the PFA orders was not misleading.  While the defense did introduce evidence of a petition for a PFA order that Petitioner had filed against

---

[9] In his reply, Petitioner states that he intended to present this and the next claim not as separate claims but as "examples demonstrating that the subject Prosecutor's conduct during the hearing were [sic] consistent with the same traits as she was being charged with."  (Reply at 6.) However, having rejected Petitioner's claim that any failure on the part of the Government to disclose the fact of the investigation into the prosecutor did not constitute a due process violation, there is no need to address these allegations as "examples" of the prosecutor's malfeasance.  I will instead give Petitioner, who is appearing pro se, the benefit of the doubt, and I will address these last two allegations as separate claims. Estelle, 429 U.S. at 106.  In so doing, I note again that the Government has addressed these claims on the merits, and will not be prejudiced by the Court doing the same.

Figueroa, there was no evidence introduced to indicate that this was a final order.  (N.T. 02/10/11

at 15-16.)  Even so, for evidentiary purposes, I treated Petitioner's PFA just like I treated the

final PFA order which was issued against him, having stated:

> I'm going to make the following ruling.  We're going to talk about all the PFAs.
> I'm concerned that that's going to digress into a trial about a PFA situation where
> mutual PFAs were issued.  [Defense] [c]ounsel wants to get into bias and motive,
> fine.  But it further confuses the issue and takes the jury on a path I don't want
> them to go if they start examining all of the little details in the documents.

> So they're going to be marked for – here's what we're doing.  They're going to be
> marked for identification.  The government is saying they don't have any
> authentication issues.  You can refer – both lawyers can refer to them to this
> extent and this extent only.  Did you have to seek protection from abuse order?
> Yes.  Showing you what's been marked as Exhibit whatever.  Is this a protection
> from abuse order?  Yes.  Who is it in favor of?  One or the other.  Who's the
> defendant?  Barry Douglas or Ms. Figueroa depending on which one.  And did a
> judge sign it?  Yes.  On what day?  This day.  And as the details of the rest of it,
> it's off limits.  That's my ruling.

(Id. at 21-22.)  On cross-examination, defense counsel was indeed able to introduce evidence of

the existence of a PFA order against Ms. Figueroa:

| Defense counsel: | [D]id there come a point in time when the two of you had to go to court in April – I think April 23rd of 2010. |
|---|---|
| Figueroa: | Yes. |
| Defense counsel: | Okay.  And you got your protection from abuse order. |
| Figueroa: | Yes. |
| Defense counsel: | And he also has a protection from abuse order issued against you, isn't that right? |
| Figueroa: | Yes, it is. |

(Id. at 46.)  As the record reflects, the prosecution did not attempt to mislead the court about the PFA orders, and, as such, appellate counsel cannot be deemed ineffective for failing to present this claim.

### 4.  Figueroa's Identification of Petitioner

Petitioner's last allegation of appellate counsel's ineffectiveness for failure to raise a claim of prosecutorial misconduct concerns Figueroa's identification of him as the robber shown in the bank surveillance video.  Petitioner contends that the prosecution's conduct was improper in that "Figueroa had conceded that prior to viewing the video footage from the bank's surveillance clips the prosecution told her that it was Petitioner."  (Br. at 9.)

Petitioner's characterization of Figueroa's testimony is inaccurate.[10]    On direct examination, the following exchange occurred between Figueroa and the prosecutor, wherein Figueroa explained how she identified Petitioner as the robber in the video:

---

[10] In his reply, Petitioner further argues that a conversation between himself and Figueroa while he was detained at the Federal Detention Center and awaiting trial "reveals that Figueroa was told that Petitioner robbed the bank, which is contrary to the Government's contentions that Figueroa was not told that Petitioner ROBBED the bank before she was shown the surveillance footage."  (Reply at 8.)  Attached to his reply was the undated transcript at issue where the following exchange occurred:

Petitioner:    Robbed a bank?  I didn't rob no bank.

Figueroa:    Yes you did . . . . [t]hen why you in jail?

Petitioner:    Because I'm accused of that.  Why would you say that?  Who told you that?

Figueroa:    That's what they said[.]

Petitioner:    Who?

Figueroa:    Don't worry about it . . . . That's what they said.

| Prosecutor: | Okay.  Did the government ask you in the last few weeks to look at some bank surveillance videos of the robbery at the Citizens Bank on Godfrey Avenue? |
|---|---|
| Figueroa: | Yes. |
| Prosecutor: | Okay.  I'm going to ask you, along with the jury, to watch four brief clips of the surveillance video.  And for each video, we'll stop it and I'd like you to tell us if you recognize the person in the video. |

. . .

(Surveillance video played)

. . .

| Prosecutor: | Do you recognize the man holding the bag in the video? |
|---|---|
| Figueroa: | (No audible response) |
| Prosecutor: | Who is that? |
| Figueroa: | It's Barry Douglas. |
| Prosecutor: | Can you tell us how you recognize him there? |
| Figueroa: | I recognize him by the build of his body, the way he's walking, his beard, the thickness of his neck. |

(Id. at 35-36.)  After Figueroa watched the final surveillance video that was shown to her, she further explained how she recognized Petitioner:

| Prosecutor: | [] Do you recognize the person in the video? |
|---|---|
| Figueroa: | Yes. |
| Prosecutor: | And who is that? |

(Attached to Reply as Exh. 2.)  Contrary to Petitioner's assertions, and in light of Figueroa's lack of specificity as to when "they" told her that Petitioner robbed the bank, this exchange does not indicate that Figueroa admitted to having been told by the Government that Petitioner robbed the bank before she viewed the surveillance footage.  In this regard, and as described in further detail within my discussion of this claim, Figueroa testified in detail as to how she recognized Petitioner as the robber in the video.

14

| | |
|---|---|
| Figueroa: | Barry Douglas. |
| Prosecutor: | Okay.  Do you recognize any of the clothing? |
| | . . . |
| Figueroa: | Well, the pants 'cause I don't think they're jeans. |
| Prosecutor: | Okay.  What kind of pants are they? |
| Figueroa: | Like the cargo type pants. |
| Prosecutor: | Can you tell us how you recognize those pants? |
| Figueroa: | When we lived together, I've seen those pants before. |

(Id. at 38.)

While Figueroa did answer "[y]es" to defense counsel's question on cross-examination as to whether "it was suggested [] that Mr. Douglas was the person in the picture," (Id. at 74), she was rehabilitated on re-direct examination:

| | |
|---|---|
| Prosecutor: | Okay.   Ms. Figueroa, when you viewed the [bank surveillance] videos, were you quite certain that it was Barry Douglas? |
| Figueroa: | Yes. |
| Prosecutor: | And that was because you recognized him or because anybody told you he would be in the videos? |
| Figueroa: | Because I recognized him. |

(Id. at 87.)   In light of this testimony, it cannot be said that Figueroa conceded that the prosecution had told her that Petitioner was the robber in the video, and, as such, appellate counsel was not ineffective for failing to present this claim.[11]

---

[11] Figueroa's testimony was further corroborated by the testimony of Agent Matthew Kessler, the FBI Agent who showed Figueroa the surveillance videos.  Agent Kessler testified that he showed

### C.  Alleged Instances of Ineffectiveness by Suppression Counsel

Petitioner makes three arguments regarding the alleged ineffectiveness of counsel at the suppression hearing.  He argues that counsel at the suppression hearing was ineffective for failing to preserve the red dye stained money, for failing to argue that the Terry stop was constitutionally unreasonable on the basis of the "completed misdemeanor" doctrine, and for failing to present phone and e-mail correspondence between himself and Figueroa.

#### 1.  The Red Dye Stained Money

Petitioner first argues that "counsel was ineffective at the suppression hearing for not requesting to preserve the money recovered from petitioner the day of his arrest that the prosecution had alleged was stained with red dye from a dye pack placed in the bag by bank tellers during the robbery."  (Br. at 15.)  He alleges that he "adamantly requested of his counsel to retrieve the currency," and had he had the opportunity to test the currency, "[t]he test results would have been exculpatory in nature . . . [and] he could [have] prove[n] that it was not dye and directed his attorney to the origin of the red substance."  (Id. at 15-16.)

In my memorandum opinion which denied Petitioner's post-trial motions, I addressed the potential exculpatory value of testing the red-stained currency.  (doc. no. 115 at 14) (addressing Petitioner's argument that "by returning to Citizens Bank the red-stained currency that was found in his pockets when he was arrested, with the knowledge that it would be given to the Federal Reserve for destruction," the government acted "in bad faith and violated due process . . . [and]

---

Figueroa the video in the U.S. Attorney's Office, that "she was just asked something to the effect of, do you recognize anyone in the video," and that neither himself nor the Government attorneys "suggest[ed] to Ms. Figueroa that the person in the video was Barry Douglas."  (N.T. 02/10/11 at 109-10.)

even if not in bad faith, the deliberate destruction of evidence justifies a new trial under Rule

33.")  In so doing, I stated:

> Red-stained money is normally of an inculpatory, rather than exculpatory, nature. While it could possibly have been the case that testing of the currency would have revealed the stain to have an origin other than the bank's dye pack, over $4000 in currency that is soaked in red dye, found on the Defendant is not apparently exculpatory evidence. . . .  Here, [] no testing of the lost evidence was ever performed or introduced at trial.  It is not as though the Government performed testing which showed that the red stain was from a bank's dye pack, and then destroyed the currency, thereby preventing the Defendant from impeaching the tests performed by the Government.  Instead, the Government only introduced evidence showing that the Defendant was in possession of red-stained currency— a fact which the Defendant has not disputed.  Both the Government and the Defendant had an equal opportunity to argue the source of the stain to the jury. Accordingly, the trial was not tainted by the introduction of testing which the Defendant had no opportunity to challenge.

(Id. at 15, 17.)

I find this reasoning to be relevant to this ineffective assistance of counsel claim.  The

absence of testing on the red-stained money did indeed allow Petitioner's trial counsel to argue

in the closing argument that the dye may have come from another source:

> You heard that money was found on my client and that there was red around the edges.  You heard absolutely no evidence, no testimony, that that red is dye from a dye pack exploding, or in this case two dye packs exploding.  Not one bit of evidence that that red that I showed you in that first picture is dye. . . . There was no testing done.  You heard no evidence of that.  What did you hear?  That [the money] was sent back not analyzed and then destroyed.
>
> . . .
>
> **Now you cannot find, from the evidence that the government has presented, that the money he's recovered with has red dye from a bank.**  And you can't find that my client is the one who committed the robbery because he had that money.  And it was never tested and then it was destroyed.

(N.T. 02/10/11 at 201, 203) (emphasis added.)

In light of the fact that Petitioner's trial counsel attempted to capitalize on the lack of testing as a means to question whether the money came from the bank, the only way that Petitioner would have been prejudiced by the destruction of the evidence would have been if the testing of the money did in fact reveal that the red stains did **not** come from the bank's dye pack. While Petitioner states in his motion that "he could [have] prove[n] that it was not dye and directed his attorney to the origin of the red substance," he does not offer any explanation for what he claims the red substance to have been. (Br. at 16.) In his reply, Petitioner similarly offers no alternate explanation with respect to the origin of the red substance, stating only that the "[substance] was not dye, which could have been verified," and "Petitioner's evidence [] would have proven that the stained money was not fresh or dye." (Reply at 7.) This lack of specificity is fatal to Petitioner's claim. See, e.g., United States v. Thomas, 221 F.3d 430, 437 (3d Cir. 2000) ("[V]ague and conclusory allegations contained in a § 2255 petition may be disposed of without further investigation by the District Court") (citing United States v. Dawson, 857 F.2d 923, 928 (3d Cir. 1988)). I therefore conclude that suppression counsel's failure to have the money preserved was a reasonable strategy which did not prejudice Petitioner.

## 2.   The <u>Terry</u> Stop

Petitioner next argues that counsel was ineffective during the suppression hearing "for not arguing a completed misdemeanor during <u>Terry</u> stop." (Mot. at 7.) He contends that the "hearsay tip" that the officer received from Figueroa's mother that he violated a PFA order was "at most equivalent to a misdemeanor," and "[t]he correct juncture to address the validity of <u>Terry</u> stops to investigate completed misdemeanors, which is the predicate of this issue, should have been properly raised at the suppression hearing." (Br. at 17-18.)

18

In order to conduct a stop to investigate a crime, an officer must have "reasonable suspicion" that "criminal activity may be afoot." Terry v. Ohio, 392 U.S. 1, 30 (1968). "The precise limits on investigatory stops . . . [are] grounded in the standard of reasonableness embodied in the Fourth Amendment, [which] balances the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion." United States v. Hensley, 469 U.S. 221, 228 (1985). The governmental interests involved in investigating completed crimes are lower than in investigating ongoing crimes. Id. (noting that "[a] stop to investigate an already completed crime does not necessarily promote the interest of crime prevention as directly as a stop to investigate suspected ongoing criminal activity.") The governmental interest in investigating a completed crime does however increase with the severity of the crime. Compare id. at 229 ("If police have a reasonable suspicion . . . that a person they encounter was involved in or is wanted in connection with a completed felony, then a Terry stop may be made to investigate that suspicion") with United States. v. Grigg, 498 F.3d 1070, 1081 (9th Cir. 2007) (although the Ninth Circuit declined "to adopt a per se standard that police may not conduct a Terry stop to investigate [] a past completed misdemeanor," the court stated that "particular attention [should be paid] to the potential for ongoing or repeated danger" in determining whether a Terry stop to investigate a completed misdemeanor was reasonable).

In his direct appeal to the Third Circuit, Petitioner raised the argument that Terry stops are inappropriate to investigate completed misdemeanors, and that any evidence recovered from that stop should have been excluded. The Third Circuit found the argument to be waived since he did not raise it in the District Court. United States v. Douglas, 522 F. App'x 125, 128 n.2 (3d

Cir. 2013) (citing <u>United States v. Rose</u>, 538 F.3d 175, 182-85 (3d Cir. 2008) (holding that, absent a showing of good cause, suppression arguments not raised in district court are waived). The Third Circuit did however address his argument that "the red-stained currency should have been suppressed" as the fruits of an unlawful <u>Terry</u> stop.  <u>Id.</u> at 128.  In so doing, the Third Circuit applied the <u>Terry</u> balancing test between the private and governmental interests and stated:

> The officer stopped Douglas to investigate the alleged violation of a Pennsylvania Protection From Abuse order ("PFA") taken out by Douglas' ex-girlfriend, Tyisha [sic] Figueroa ("Figueroa"), pursuant to 23 Pa.C.S. § 6101 et seq. The officer learned of the potential violation after he was flagged down by Figueroa's mother, who gave him a detailed description of Douglas, and explained that Douglas had violated a PFA by visiting her family's barbershop where her daughter was working at the time. After driving in the direction indicated by Figueroa's mother, the officer stopped Douglas who fit the description given by Figueroa's mother and who admitted that he had come from a barbershop. The officer therefore had reasonable suspicion to believe that Douglas had recently violated a PFA.

> The significant Government interest in enforcing a PFA justified the brief intrusion of the stop. PFAs are designed to "further the Commonwealth's compelling State interest to protect victims of domestic violence from abuse." Act of Nov. 10, 2005, 2005 Pa. Laws 335. The stop, which lasted no more than seven minutes, was reasonably designed to protect this important state interest.

> The officer's consultation of his mobile data terminal quickly confirmed the existence of the PFA, and Figueroa arrived a few minutes later to provide a firsthand account of the violation.

> The officer's decision to confine Douglas to the back of the police car was also reasonable. Placing Douglas in the police car allowed the officer time to investigate and prevented confrontation between Douglas and Figueroa and her mother.  Because the intrusiveness of the stop was justified by the importance of the Government interest in protecting victims of domestic abuse, the District Court did not err in denying Douglas' motion to suppress the red-stained currency.

<u>Id.</u> (footnotes omitted).[12]

---

[12] In two footnotes, the Third Circuit added that "the stop was not excessively intrusive," even if one were to believe Petitioner's contention that "he [had been] handcuffed before being placed in the car," and that his argument that he "should have been asked to sit on the curb or had his

I need not add much else to the Third Circuit's treatment of the <u>Terry</u> stop issue.  The governmental interest in preventing domestic violence and enforcing a PFA order (as the statute itself reflects) is indeed compelling, even if the violation of such an order may not be a felony. While Petitioner was detained for over five minutes prior to his arrest for violating the order, and may even have been handcuffed during that time, the intrusiveness of the stop was justified by this important governmental interest.  In light of this, Petitioner cannot be deemed to have been prejudiced by the failure of counsel at the suppression hearing to argue that the <u>Terry</u> stop to investigate a "completed misdemeanor" was constitutionally unreasonable.

### 3. Phone and E-mail Correspondence Between Petitioner and Figueroa

Petitioner next contends that counsel was ineffective at the suppression hearing for failing to present "phone conversations by Figueroa and Petitioner procured through the federal detention center where Petitioner was being held awaiting trial" and e-mail correspondence between him and Figueroa "that would have been exculpatory in nature."  (Br. at 16-17.)  With respect to the phone conversations, Petitioner argues that:

> The conversations revealed that Figueroa was lying when she told authorities / prosecution that she witnessed Petitioner getting a haircut.  The prosecution utilized Figueroa for identification purposes, in part to depict petitioner as the robber of the bank through a grainy type video footage from the bank's surveillance clips.  This evidence is substantial based on the fact of the hearing being predicated on what evidence and testimony was permissable [sic] for trial. It shows that Figueroa was not truthful and acting out of revenge utilizing authorities in her planned attack.

---

information collected for a later follow up by the police" also failed since "[t]he Supreme Court has instructed us not to 'indulge in unrealistic second-guessing' in 'a swiftly developing situation.'"  <u>Douglas</u>, 522 F. App'x at 128 n.3, n.4 (quoting <u>United States v. Sharpe</u>, 470 U.S. 675, 686 (1985)).

(Id. at 16.)  With respect to the e-mails, Douglas argues that they would have "suggest[ed] that Figueroa has the propensity to overstate domestic disputes between her and Petitioner, and initiate overstated predicated [sic] for charges against petitioner in order to utilize authorities for revenge against Petitioner."  (Id. at 17.)

       Attached to his reply are a transcript of the phone conversations and a copy of the e-mails at issue.  In the transcript of the phone conversations[13], Petitioner has highlighted a section of the conversation wherein Figueroa states that she did not see him at the barber shop on the day of the robbery:

| | |
|---|---|
| Petitioner: | We didn't have contact that day. |
| Figueroa: | The day you got locked up? |
| Petitioner: | Yeah. |
| Figueroa: | Yeah you did.  You called me. |
| Petitioner: | No we did . . . we didn't have contact that day.  I didn't see you. |
| Figueroa: | You didn't see me, but you tried to call me to meet up with me. |

(Phone transcript, attached as Exh. 1 to Reply.)   With respect to the e-mails, Petitioner has included an e-mail exchange between himself and Figueroa from May 8, 2010 – May 22, 2010, highlighting three emails in particular from Figueroa:

[May 8, 2010]
I need to talk to you … i know you want nothing to do with me but can we talk. i
need you so bad…sheriff called for you.. he said call him asap .. baby I miss you
so much…i love you…im in love with you..please call me as soon as you get this
.. I love you.

[May 11, 2010]

---

[13] There is no indication on the transcript as to the date of the phone conversations.  I will however accept as true Petitioner's contention that these phone conversations took place before the suppression hearing.

> I never tried getting you locked up..i was so mad that you touched me..we need to meet up somewhere so we can talk face to face..i love you.
>
> [May 13, 2010]
> Lets meet today at strawberry square at 5:30 or is that not a good time for u.

(E-mail correspondence, attached as Exh. 3 to Reply.)

Counsel was not ineffective at the suppression hearing for failing to present these phone conversations or these e-mails. At that hearing, Figueroa's testimony was elicited only in connection with the defense motion to suppress the red dye stained money as the fruits of an unconstitutional <u>Terry</u> stop. (N.T. 01/19/11 at 3-4, 41.) Whether or not Figueroa had a tendency to overstate domestic disputes or was acting out of revenge is irrelevant to the pertinent question of what information the arresting officer was operating under at the time of the initiation of the stop. In that regard, the arresting officer's testimony at the suppression hearing, that he stopped Petitioner after having been flagged down by Figueroa's mother and told that Petitioner had violated a PFA order, was uncontroverted, and could not have been undermined by presentation of these telephone conversations or e-mails. (<u>Id.</u> at 6-7.) This claim of ineffectiveness fails.

### C.      Failure to Call Witnesses

Petitioner's next three arguments concern allegations that counsel was ineffective for failing to call certain individuals as witnesses. In order to prevail on a claim of ineffective assistance of counsel based on failure to call a witness, Petitioner would need to show:

> (1) that the witness existed; (2) that the witness was available; (3) that counsel was informed of the existence of the witness or should have known of the witness's existence; (4) that the witness was prepared to cooperate and would have testified on [petitioner's] behalf; and (5) that the absence of the testimony prejudiced appellant.

Moore v. DiGuglielmo, 489 F. App'x 618, 625 (quoting Commonwealth v. Fulton, 830 A.2d 567, 572 (Pa. 2003).[14]

### 1.   The Barber

Petitioner first argues that counsel at the suppression hearing and later at trial were ineffective for failing to call his barber as a witness.  (Br. at 19-21.)  In support of his argument, Petitioner attaches the FBI transcription of its interview with the barber who is identified as Ubaldo Deleon Quinones, AKA Domi, which he states was given to defense counsel during discovery.  (FBI form 302, attached as Exh. 4 to Reply.)  While I am satisfied that Petitioner has shown that the witness existed and that trial counsel knew of the witness's existence, I note that he has not addressed two of the five factors outlined in Moore, having failed to provide any documentation to indicate that the barber was available or willing to testify on his behalf.

Even if Petitioner had addressed these factors, he has not shown that any prejudice resulted from counsel's failure to call the barber as a witness.  Petitioner cites to the barber's potential testimony at the suppression hearing that Figueroa did not work at the barber shop.  Petitioner claims that this would have supported his argument that "[t]his witness would [] be substantial in determining whether the arresting officer acted in a manner appropriate to the circumstances."  (Br. at 19.)  Petitioner seems to be again referencing the Terry stop, which was initiated after the arresting officer received information from Figueroa's mother that Petitioner had been at the barber shop where Figueroa worked and thus violated the PFA order.  But, even if the barber had testified that Figueroa was not at the barber shop when Petitioner was there, this

---

[14] This five-pronged test has not been expressly adopted by the Third Circuit.  However, as the Third Circuit noted in Moore, "[t]he five requirements set forth by the Pennsylvania Supreme Court would necessarily need to be shown to prevail under Strickland on a claim of this nature." Id. at 625.  As such, I find it relevant to my analysis here.

would not change the fact that the arresting officer, when he initiated the <u>Terry</u> stop, was operating under information that Petitioner had violated the PFA order.   Under those circumstances, the barber's potential testimony would not have lent any support to Petitioner's argument that the <u>Terry</u> stop was unconstitutional, and would not have affected the outcome of the suppression hearing.

Petitioner also contends that the "barber would have testified that Petitioner did not get his beard trimmed."[15]   (Br. at 19.)   He argues that "[t]his evidence is substantial based on the prosecution's hypothesis that led to a jury instruction that petitioner changed his appearance. The perpetrator of the robbery had a full beard, when petitioner was arrested he did not have a full beard and further testimony indicated that he was never witnessed with a full beard prior to the robbery."   (<u>Id.</u> at 19.)   However, even if the barber testified that he did not trim Petitioner's beard on the day of the robbery, this would not have precluded the possibility that some other barber (or Petitioner himself) trimmed the beard.   Petitioner's claim that counsel at both the suppression hearing and at trial were ineffective for failing to call his barber as a witness is therefore without merit.

### 2.   Detective Williams

Petitioner next contends that trial counsel was ineffective for failing to call Detective Williams as a witness, whom he identifies as the police official who interviewed and prepared Figueroa's statement.   (Reply at 13.)   He claims that Detective Williams would have "show[n] the inconsistent accounts of Figueroa who claimed that someone added allegations to her

---

[15] The transcription of the FBI interview with the barber states that "Douglas possibly had some facial hair that day, but did not have a full beard.   [The barber] may have trimmed the edges of the facial hair, but did not shave or cut the entire area of facial hair."   (FBI form 302, attached as Exh. 4 to Reply.)

statement," and "would [have] be[en] substantial for credibility purposes demonstrating that Figueroa was using this trial for revenge against petitioner and not being truthful with identification of Petitioner being similar to her opinion of the robber in the surveillance clips." (Br. at 23.)

Petitioner has again not plead at least two of the five prongs in <u>Moore</u>, namely, whether Detective Williams was available or willing to testify on his behalf.  In any event, I cannot conclude that the absence of testimony from Detective Williams prejudiced Petitioner.  Trial counsel subjected Figueroa to a lengthy cross-examination about the statement, impeaching her credibility as he brought to light certain inconsistencies with that statement and other statements she had made.  (N.T. 02/10/11 at 63-73.)  For instance, while the statement (which Figueroa signed) provided that she arrived on the scene in a car with her mother as they were following Petitioner, Figueroa testified that she actually arrived on the scene with her cousin.  (<u>Id.</u> at 73.) In light of this, it is unclear how the testimony of Detective Williams, who Petitioner states would have "testif[ied] that Figueroa's statement was an accurate assessment," (Reply at 13), would have further impeached Figueroa's testimony.   Accordingly, trial counsel was not ineffective for failing to call Detective Williams as a witness.

### 3.  The Bank Security Guard

Petitioner next contends that "[trial] counsel was ineffective for not calling the security guard of the bank – Roberto Rivera as a witness who on June 22nd was shown a photo of Petitioner and stated that he did not think he was the robber."  (Br. at 22.)  He argues that Rivera "should have been investigated to determine what characteristic[s] differentiated the robber from Petitioner."  (<u>Id.</u>at 23.)

Petitioner's claim fails.  While Rivera was shown a photo array of eight individuals on June 22, 2010 (six months after the robbery) with Petitioner's picture in it, Petitioner mischaracterizes Rivera as having stated that he did not think Petitioner was the robber.  According to the FBI form, "[a]fter viewing the array, **RIVERA was not able to make an identification**."  (FBI form 302, Gov. Exh. 103, attached as Exh. A to doc. no. 145) (emphasis in original.)  The inability to make a positive identification is different than definitively stating that someone is not the perpetrator, and it is certainly less probative of the proposition that Petitioner was misidentified as the robber.[16]  As a result, trial counsel was not ineffective for failing to call Rivera as a witness.

### D.   Petitioner's Clothing

Petitioner next contends that both suppression and trial counsel were ineffective for failing to preserve his clothing which was confiscated on the day of his arrest.  With respect to the suppression hearing, he argues that "[t]his evidence was substantial in determining the evaluation of the evidence to be suppressed via whether the government's witnesses were truthful" in that while "[t]he arresting officer alleged that . . . when he confiscated the money from petitioner's pocket red dye was sticking to his (the officer's) hand . . . there was absolutely no red dye in Petitioner's pocket nor on any other clothing worn by petitioner nor on any skin area."  (Br. at 19-20.)  With respect to the trial, Petitioner contends that trial counsel was

---

[16] FBI Agent Kessler, who investigated the bank robbery as part of the Philadelphia Violent Crimes Task Force, also misstated Rivera's response to the photo array.  When pressed by trial counsel on cross-examination, ("But suffice it to say on 6/22 when [Rivera]'s shown the photo with the spread . . . he doesn't think Mr. Douglas is the robber, right?"), Agent Kessler responded "[t]hat's what [the FBI form] indicates, yes."  (N.T. 02/09/11 at 149.)  In light of this testimony, trial counsel's failure to call Rivera was actually a benefit to Petitioner.  If Rivera had been called to the stand, he would have been subjected to cross-examination, and the prosecutor would have been able to establish, contrary to Agent Kessler's testimony, that Rivera did not definitively state that Petitioner was not the robber.

ineffective "for not presenting the fact that petitioner did not have red dye stain in the pocket of the pants he was wearing during his arrest." (Id. at 21.)  He argues that the arresting officer's testimony that red dye was sticking to his hands when he confiscated the money from petitioner "led the jury to believe that the allege [sic] dye was fresh," but "had petitioner's counsel presented the facts that . . . there was absolutely no red dye nor any other color disfigurement present [on the clothing] the jury would have to infer that the officer was attempting to mislead them." (Id. at 22.)

Petitioner is not entitled to relief on these claims.  As an initial matter, he has presented no evidence to indicate that the clothing was even confiscated by the police.  Even if the clothing was confiscated (and contained no red dye) the testimony elicited at trial indicated that while the robber was wearing pants and a brown shirt at the time of the robbery, Petitioner was wearing shorts and a white t-shirt at the time of the arrest.  (Compare N.T. 02/09/11 at 40-41 with N.T. 02/10/11 at 106.)  In light of this, it is questionable that the lack of red dye on the clothes that Petitioner was wearing at the time of the arrest (as opposed to the time of the robbery) would have affected the evaluation of the evidence to be suppressed or had any probative value on the question of whether he robbed the bank.

Moreover, contrary to his assertions, trial counsel did point out that there was no evidence to indicate that there was dye on Petitioner's body or on his clothing.  As trial counsel stated in the closing argument, while the "dye stains the person and that is how [the police] can determine and find out who robbed the bank  . . . there's absolutely no evidence of any dye stained anything, any red stained on Mr. [Douglas]'s hands or clothing." (N.T. 02/10/11 at 195.) Petitioner is due no relief on this claim.

### E.       The Bank Manager's Identification of Petitioner

Petitioner next contends that appellate counsel was ineffective for failing to appeal my denial of his motion to suppress Savage's (the bank manager's) identification of him.[17]   He claims that the identification was constitutionally improper since the photo array included photos of people who did not match the description of the robber[18], and that the police suggestively showed Savage "the surveillance clips prior to the photo array containing Petitioner's picture."

My order denying "Defendant's Motion to Suppress Out-of-Court and In-Court Identifications" summarized the circumstances surrounding Ms. Savage's out-of-court identification of Defendant:

> Savage was the assistant bank manager on duty on the day of the robbery. Around 10:25 a.m. that day, the robber approached Savage's desk, spoke with her for a few moments, raised his shirt and pulled out a handgun and plastic bag from his waistband.  The robber pointed the gun at Savage and told her to go to the tellers' area.  The robber then forced Savage and the tellers [to] lie down on the vault floor and Savage instructed three tellers to give the robber money.  After the robber collected the money, which included dye packs, he left the bank.  During this incident, Savage had an opportunity to view the robber for several minutes at close range
>
> Savage described the robber as a black male, 5'7" to 5'8", with a beard and mustache, wearing a tan button-up shirt, tan pants, dark sunglasses, and a tan "sun style" hat.  Within an hour of the robbery, an investigating officer showed Savage

---

[17] While Petitioner does not include this ground as a basis for relief in the form motion, he does include it in the accompanying memorandum of law.  (Br. at 25-26.)

[18] Petitioner writes about the photo array:  "[O]ut of eight photo's [sic] two of the individuals did not have beards as Savage had claimed she witnessed as the robber's description; one individual was light skinned, contrary to Savage['s] description that the robber was [] dark skinned; and three individuals where [sic] small in structure and thin, which is also contrary to Savage's description."  (Br. at 26.)

a still photo from a bank surveillance camera and Savage identified the individual in the picture as the robber.

Defendant was arrested the same day around 4:00 p.m., based on circumstances unrelated to the bank robbery.  At the police station, approximately $5,000, stained with wet red dye, was found in his pocket.

Detective Garvin then assembled a photo array including a picture of Defendant, in the number five spot, and seven other black males of similar characteristics. (See Appendix A.)  Garvin showed this array to Savage at the bank on June 22, 2010.  Garvin advised Savage that the suspect may or may not be in the array. Without hesitation, Savage identified the man in the number five spot, Defendant, as the bank robber.

(doc. no. 26) (paragraph numbers omitted.)

I then went on to discuss Petitioner's motion to suppress the identification.  I concluded that there was nothing suggestive about showing Savage the surveillance video, that the photo array was not suggestive (and even if it was that the identification was nonetheless reliable), and, as such, that any potential in-court identification made by Ms. Savage of Petitioner would not be tainted by an unduly suggestive out-of-court-identification.  (Id.)  In so doing, I stated:

Identification evidence is admissible as long as the procedures leading up to the identification were not impermissibly suggestive or unreliable.  Neil v. Biggers, 409 U.S. 188, 199 (1972).  Eyewitness testimony is permissible unless the pre-trial procedure was so unduly suggestive as to give rise to a substantial likelihood of misidentification, and it is the defendant's burden to prove that the procedure was unduly suggestive.  United States v. Clausen, 328 F.3d 708, 712-13 (3d Cir. 2003).  If the Court determines that the identification was unduly suggestive, then the Court must determine whether or not it is nonetheless reliable by considering: (1) the witness's opportunity to observe the defendant; (2) the witness's degree of attention during the observation; (3) the witness's accuracy in the initial description; (4) the witness's degree of certainty when viewing defendant's image; and (5) the length of time between the observation of the crime scene and the identification.  Biggers, 409 U.S. at 200-01.

There is nothing suggestive about investigating officers showing Savage, an eyewitness to the bank robbery, a surveillance photo.  Savage was not asked to identify a specific perpetrator, she was merely asked to identify whether the picture accurately depicted the robber.  Surveillance photos of a robber displayed to bank employees do not improperly suggest any particular suspect.  United

States v. Miller, 961 F.2d 217 (9th Cir. 1992). Furthermore, Savage had several minutes of up-close contact with the robber when she was shown the surveillance photo so there is little risk for misidentification. Accordingly, the Government may introduce Savage's identification that the surveillance photo at issue depicts the robber.

We next address whether or not the photo array is suggestive. Detective Garvin, who has prepared "hundreds" of photo arrays, created the photo array at issue from a selection of computer generated search results based on physical criteria that matched that of Defendant, who was a suspect in the bank robbery at the time the photo array was created. Defendant argues that the photo array contains individuals who are so dissimilar to Defendant that the array is unduly suggestive. A view of the photo array, attached as Appendix A, demonstrates just the opposite. All eight men are African-American and appear to be of approximately the same age and build as Defendant. All eight men also generally have similar facial characteristics. In short, the photo array speaks for itself. See United States v. Lawrence, 349 F.3d 109, 114-16 (3d Cir. 2003) (not a denial of due process when photo array had five individuals in mug shots and the defendant as the only person bare chested and wearing jewelry).

Additionally, we find nothing about the procedures implemented by Detective Garvin in showing the photo array to Savage to be unduly suggestive. Garvin advised Savage that the suspect may or may not be in the photo array and did nothing to suggest one photo over another. Savage was shown the photo array within a day of the robbery, and consequently, the characteristics of the robber, who she had been up-close with for several minutes, were still fresh in her mind. Upon reviewing the photo array, Savage identified Defendant very quickly. Even if we were to conclude that there was some type of suggestiveness associated with the photo array, the surrounding circumstances would also satisfy the Biggers factors for reliability.

Finally, we must consider whether or not an in-court identification of Defendant by Savage is admissible. The standard for admitting in-court identifications is the same as out-of-court identifications. Clausen, 328 F.3d at 713. Here, because Savage's two out-of-court identifications were not unduly suggestive, they cannot taint Savage's potential in-court identification of Defendant. While the presence of a defendant in a criminal case can be suggestive, without more, there is nothing at this time to establish that Savage's potential in-court identification is unduly suggestive and/or unreliable. Accordingly, the Government may attempt to elicit an in-court identification from Savage.

(Id.) (paragraph numbers omitted.)

After a thorough review of the law surrounding the admissibility of eyewitness testimony, the transcript from the suppression hearing on Petitioner's motion to suppress the

identification, (N.T. 01/04/11 at 47-73), and the photo array itself, I again conclude that the in-court and out-of-court identification of Petitioner by Ms. Savage was constitutionally permissible.  There was indeed nothing suggestive about showing Ms. Savage the surveillance photo and asking her whether the picture accurately depicted the robber, and then for her to be presented with a photo array which included a picture of Petitioner.  As for the photo array itself, I find that the similarity between the eight individuals depicted was such that it was not unduly suggestive.  (Photo array, attached as Attachment C to Response.)  In light of my finding that Ms. Savage's identification of Petitioner as the robber was admissible, I conclude that Petitioner was not prejudiced within the meaning of Strickland by appellate counsel's failure to raise this issue on appeal.  Petitioner is due no relief on this claim of ineffectiveness of counsel.

### F.   An Evidentiary Hearing

Petitioner argues that he is entitled to an evidentiary hearing on his motion.  28 U.S.C. § 2255(b) provides that an evidentiary hearing shall be held "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief."  "In the context of an ineffective assistance of counsel claim presented in a § 2255 petition, a district court must therefore determine whether, considering as true all 'nonfrivolous' factual claims, the petitioner 'states a colorable claim for relief' under Strickland []---that is, that counsel's performance was deficient and that this deficiency prejudiced the petitioner." Cherys v. U.S., 405 F. App'x 589, 591 (3d Cir. 2011) (citing United States v. Dawson, 857 F.2d. 923, 928 (3d Cir. 1988)).  In other words, a "[d]istrict [c]ourt's decision not to hold an evidentiary hearing will be an abuse of discretion unless it can be conclusively shown that [the petitioner] cannot make out a claim for ineffective assistance of counsel."  United States v. Lilly, 536 F.3d 190, 195 (3d Cir. 2008).

Petitioner is not entitled to an evidentiary hearing on his motion.  Having considered the parties' briefs, the attachments thereto, and the entire case file, and having disposed of all of his ineffectiveness claims on the ground of lack of sufficient prejudice, I have conclusively found that his claims do not constitute grounds for relief, and an evidentiary hearing is unwarranted.

III.    CONCLUSION

For the reasons stated herein, Petitioner's § 2255 motion is denied, he is not entitled to an evidentiary hearing, and a certificate of appealability shall not issue.

An appropriate Order follows.